# STATE OF CONNECTICUT *v.* ABIN BRITTON
## (SC 17412)

Borden, Norcott, Katz, Palmer, Vertefeuille, Zarella and Sullivan, Js.*

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued April 11—officially released August 21, 2007

*Pamela S. Nagy,* special public defender, for the appellant (defendant).

*Michael L. Regan,* state's attorney, and *Peter A. McShane,* senior assistant state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. The defendant, Abin Britton, appeals directly to this court pursuant to General Statutes § 51-199 (b) (3)[1] from his judgment of conviction, rendered after a jury trial, of one count of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1), one count of felony murder in violation of General Statutes § 53a-54c, two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and (B), and one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (1). The defendant was acquitted of charges of capital felony and murder.

The defendant raises two issues on appeal. First, he contends that the trial court improperly denied his motion to suppress certain statements he made to police based on the court's conclusion that the defendant was not in custody and therefore could give police a statement regarding his involvement in the murder

---

[1] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

of the victim, James Connor, without having been given *Miranda* warnings.[2] Second, the defendant claims that the trial court improperly deprived him of a fair trial and an impartial jury by explaining to the jury that if the defendant were found guilty of capital felony, during the penalty phase, the jury would hear evidence regarding the aggravating factor set forth in General Statutes § 53a-46a (i) (1), that is, that the offense charged had occurred during the commission of a felony and that the defendant previously had been convicted of the same felony. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim visited his parents at their boat located in the Essex Marina at approximately 11 p.m. on August 22, 1998, the night he later was killed. He was accompanied by two female friends, and after a short visit, the victim told his parents that he and his friends were going to a nearby bar called the Black Seal. The victim drove his father's grey Saab 9000 four door sedan to the Black Seal and left sometime before 1:30 a.m. The victim then drove alone to Lucky's Café (Lucky's), looking to purchase crack cocaine. The victim met the defendant, Gregory Pierre and Jeffrey Smith at Lucky's, and, after the defendant stated that he could get the victim some cocaine, they all left the bar in order to complete the drug transaction.

The victim bought two small bags of crack cocaine in exchange for $20, and he and the defendant, with Pierre and Smith following in a separate vehicle, drove to Pierre's apartment complex in New London so that the victim could use the drugs he had just purchased. Once they arrived at the apartment complex, Pierre,

---

[2] *Miranda* v. *Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed").

Smith and the defendant pulled the victim out of the Saab and beat him. When this attack ceased, the victim was badly injured but still alive. The three men then put the victim into the backseat of the Saab and brought him to a nearby parking lot abutting Bates Woods, a park in New London. They pulled the victim out of the car once more, and this time beat him to death. Pierre, Smith and the defendant then dragged the victim's body into Bates Woods, where they covered the body with dirt and plastic bags. The defendant disposed of the victim's Saab by pushing it into a small pond behind the Waterford police department.

According to Harrison Fortier, a sergeant with the Waterford police department, the police were alerted at approximately 6:30 a.m. on August 23, 1998, that a car had been abandoned with its front tires submerged in the duck pond near the police station. Upon looking inside the car, Fortier noticed red stains, which led him to believe that someone may have been injured inside. Fortier cross-referenced the license plate of the vehicle with the department of motor vehicles and discovered that the car was registered to Donald Connor, the victim's father. Police also found two palm prints on the outside of the vehicle, which were later identified as matching the defendant's palms.

In January, 1999, a badly decomposed body was found in Bates Woods. Harold Wayne Carver II, chief medical examiner for the state, examined the remains and identified them as belonging to the victim. Carver classified the manner of death as a homicide.

In the course of their investigation, the police developed a list of three suspects—Pierre, Smith and the defendant—who they believed were responsible for the victim's death. Detectives Thomas Murray of the Connecticut state police and Rod Gaynor of the New London police department visited one of these suspects,

the defendant, in order to obtain his palm prints. Murray and Gaynor went to the defendant's home and asked him to accompany them to the police station, where they took his palm prints and then turned him over to Detectives James McGlynn of the Connecticut state police and David Gigliotti of the New London police department for questioning. McGlynn and Gigliotti informed the defendant repeatedly that he was not under arrest and that he was free to leave at any time. The door to the office where the detectives interviewed the defendant was not locked, and the defendant was not handcuffed. The defendant gave a statement while at the police station describing his involvement in the victim's death and also drew a diagram of where he said the victim's body was located. McGlynn and Gigliotti drove the defendant home at the conclusion of the interview.

The defendant subsequently was arrested and charged in connection with the victim's death. The defendant filed a pretrial motion to suppress both his statements and the diagram he had drawn for the police. The defendant claimed that the statements and the map had been procured in the course of a custodial interrogation, but without the necessary *Miranda* warnings having been given to him. After a hearing, the trial court denied the defendant's motion to suppress. After the trial, the jury returned a verdict of guilty of first degree manslaughter, felony murder, first degree kidnapping and first degree robbery. The trial court thereafter rendered judgment in accordance with the verdict and sentenced the defendant to a total effective sentence of eighty-five years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court improperly denied his motion to suppress the statements he

had made to police regarding the murder, wherein he claimed that the police had subjected him to custodial interrogation without apprising him of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The defendant also claims that the trial court determined that the defendant was not in custody without properly taking into account the totality of the circumstances. We conclude that the trial court properly determined that a reasonable person in the defendant's position would not have believed that he was in custody at the time he made his statements to police and, therefore, his *Miranda* rights had not yet attached. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress.

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. [Id., 444]. . . . As stated by the United States Supreme Court in *California* v. *Beheler*, [463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)], [a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. [*Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)]. . . . Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* rights are required, *the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest.*" (Citations omitted; emphasis in original; internal quotation marks omitted.)

*State* v. *Tomasko*, 238 Conn. 253, 267–68, 681 A.2d 922 (1996).

"The defendant bears the burden of proving that he was in custody for *Miranda* purposes. . . . Two discrete inquiries are essential to determine custody: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry is factual, and we will not overturn the trial court's determination of the historical circumstances surrounding the defendant's interrogation unless it is clearly erroneous. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. . . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 393–94, 908 A.2d 506 (2006).

In the present case, the defendant does not challenge the trial court's factual findings regarding the circumstances surrounding the interrogation, but, rather, challenges the trial court's determination that the defendant was not in custody when he made the statements at issue to the police. The defendant claims that the trial court took a limited view of the facts and failed to consider the totality of the circumstances. Specifically, the defendant claims that the trial court improperly concluded that a reasonable person in his situation would have felt free to leave. Mindful of the constitutional nature of the claim, we have conducted a scrupulous examination of the transcripts of the suppression hearing and the trial court's ruling thereon. See *State* v. *Pinder*, 250 Conn. 385, 411, 736 A.2d 857 (1999) ("[w]e . . . conduct an independent review in light of the totality of the circumstances by scrupulously examining the

record to determine if an application of the law to the facts leads us to conclude that the defendant was in custody"). We conclude that, contrary to the defendant's assertion, the trial court properly determined that the defendant did not carry his burden of proving that he was subject to custodial interrogation for *Miranda* purposes.

The following additional facts are based on the testimony adduced at the suppression hearing. Dressed in plain clothes, Detectives Murray and Gaynor drove to the defendant's home and asked the defendant to accompany them to the New London police station on February 10, 1999. When the detectives arrived at the defendant's residence, in addition to the defendant, there was a woman as well as an aggressive dog, and the detectives remained at the threshold of the apartment. Murray and Gaynor did not show any force or draw their weapons. The two detectives informed the defendant that he was not under arrest and that they would drive him back to his home when they were finished collecting his palm prints. The defendant received a telephone call before he left, and the detectives waited while the defendant took the call. After completing his call, the defendant, who was not handcuffed, rode in the front seat of Gaynor's car while Murray sat in the back. Murray testified that he and Gaynor did not have an arrest warrant for the defendant and that he had explained to the defendant that he was not compelled to accompany them to the police station, but could instead refuse their invitation.

Upon arriving at the police station, Murray and Gaynor parked behind the station, and all three men entered through the rear private entrance. Once inside the police station, Murray and Gaynor obtained the defendant's palm prints in a small office that was "used for administrative purposes." Murray described the office as "a boss' office." The defendant signed a con-

sent to search form advising him that the detectives wanted to take his palm prints and informing him of his right to refuse the search. Murray described the defendant as "suspicious of police and a little nervous . . . but he was cooperative and didn't ask to leave."

After taking the defendant's palm prints, Murray and Gaynor left and were replaced by Detectives McGlynn and Gigliotti, who both interviewed the defendant. McGlynn testified that the defendant was not hand-cuffed during the interview, that the door to the office remained unlocked, and that the defendant never was told that he was under arrest. Rather, McGlynn and Gigliotti repeatedly told the defendant that he was free to leave throughout the interview. McGlynn also told the defendant that he did not have to answer any of the detectives' questions. Describing the interview with the defendant, McGlynn testified that it was conversational in nature. During the course of the interview, the defendant changed his story several times; however, once the story became consistent, McGlynn and Gigliotti asked the defendant if he would be willing to put his statement in writing. The defendant agreed and signed all six pages of the statement.

According to McGlynn, the interview was conducted around lunchtime, and the defendant declined the food he was offered, but accepted a soda. The defendant also was permitted to use the bathroom at the police station; he was escorted to it but not followed inside. At one point during the interview, the defendant expressed concern that his daughter would return from school and that he would not be there to pick her up. In response, McGlynn reassured the defendant that he and Gigliotti would give the defendant a ride home.

Although the defendant initially was polite and calm, McGlynn testified that the defendant became agitated when Sergeant Paul Heon of the Connecticut state

police, McGlynn's immediate supervisor, questioned the veracity of the defendant's written statement. In response to Heon's accusation, the defendant became upset and tore his statement into four pieces. The defendant eventually calmed down, and apologized for tearing up his statement. McGlynn and Gigliotti thereafter asked if the defendant would be willing to draw a diagram of where the victim was buried in Bates Woods, and he complied with the request. McGlynn testified that the diagram detailed the park, the driveway connecting the road to the parking lot abutting the park, and the hill where the defendant claimed the victim's body was located. Shortly after the defendant completed the diagram, McGlynn and Gigliotti drove him home. The defendant had spent nearly six and one-half hours at the police department, and the interview had lasted approximately five hours.

The defendant filed a pretrial motion seeking to suppress all of the statements that he had made to the police, claiming that they were obtained in violation of his rights under the fourth, fifth, sixth and fourteenth amendments to the United States constitution, and article first, §§ 7, 8 and 9, of the Connecticut constitution. In his motion, the defendant asserted that, when he had made the statements at issue, he was in police custody and had not yet received *Miranda* warnings. Accordingly, the defendant claimed that both his statements and the diagram he drew for police should be suppressed.

After a hearing, the trial court denied the defendant's motion to suppress. In its oral decision on the record, the trial court found that the defendant had not been in custody and therefore was not entitled to *Miranda* warnings when he was questioned by police. The trial court credited the detectives' testimony that the defendant never had been handcuffed and that no force had been used against him. Furthermore, although the door

to the room where the defendant was interviewed had remained closed, there was no evidence that the door had been locked. The trial court further found that the defendant repeatedly had been told that he could leave, noting that "Gaynor told [the defendant] not only that he wasn't under arrest but that he could leave at any time," and "[t]he court [likewise] credit[ed] the testimony of [McGlynn and Gigliotti] . . . that [the defendant] was initially told that he was not under arrest and that he could leave at any time . . . ."

"We previously have stated that a fact finder reasonably might find that a reasonable person would feel free to leave when that person was told repeatedly that he could do so. See *State* v. *Greenfield*, 228 Conn. 62, 71 n.10, 634 A.2d 879 (1993) ('an important factor distinguishing a consensual encounter from a seizure is whether the police expressly informed the defendant that he was free to leave at the outset of the interview'); *State* v. *Northrop*, 213 Conn. 405, 415, 568 A.2d 439 (1990) ('[i]t is difficult to conceive of a "reasonable man" who would not feel free to leave after having been told so many times and in so many ways that he could')." *State* v. *Pinder*, supra, 250 Conn. 413.

In the present case, the defendant was told multiple times that he was free to leave and that he could refuse to answer any of the detectives' questions. Although we are concerned "with protecting defendants against interrogations that take place in a police-dominated atmosphere, containing inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely"; (internal quotation marks omitted) id., 414; this court has also determined that "[a] person, even if a suspect in a crime, is not in custody every time he is asked questions at a police station." *State* v. *Northrop*, supra, 213 Conn. 415. We disagree with the defendant's claim that the trial court improp-

erly determined that a reasonable person would have felt free to leave after he had been told repeatedly by multiple police officers that he could do just that.

In *State* v. *Turner*, 267 Conn. 414, 838 A.2d 947, cert. denied, 543 U.S. 809, 125 S. Ct. 36, 160 L. Ed. 2d 12 (2004), we reviewed a claim similar to the one made by the defendant in the present case. In *Turner*, the defendant voluntarily had accompanied a detective to the police station, where he was questioned about his sexual involvement with a fifteen year old girl. Id., 418–20. As a result of the statement that the defendant made to police, he ultimately was charged with sexual assault in the second degree and risk of injury to a child. Id., 420. The defendant later claimed that his statement was inadmissible because he had been subject to custodial interrogation without first having been notified of his *Miranda* rights. Id.

In *State* v. *Turner*, supra, 267 Conn. 434–38, we set forth the analysis that this court uses in determining whether we consider a defendant to be in custody for *Miranda* purposes by reviewing our decisions in *State* v. *Pinder*, supra, 250 Conn. 385, and *State* v. *Atkinson*, 235 Conn. 748, 670 A.2d 276 (1996). In both *Pinder* and *Atkinson*, we determined that an individual must be deprived of his freedom of movement in order for us to consider him in custody.

In *State* v. *Pinder*, supra, 250 Conn. 387–88, police asked the defendant to take a polygraph test after identifying inconsistencies in his prior statement. "The defendant had been told that he was not required to take the polygraph test and that he could leave at any time. . . . We held that the defendant had not been in custody at any time during his questioning because he took the test of his own volition and he repeatedly was told that he was free to leave at any time." (Citation omitted.) *State* v. *Turner*, supra, 267 Conn. 437; see also *Oregon*

v. *Mathiason,* supra, 429 U.S. 494 (holding that *Miranda* warnings were not required where defendant had not been in custody "or otherwise deprived of his freedom of action in any significant way" [internal quotation marks omitted]).

In *State* v. *Atkinson,* supra, 235 Conn. 753, detectives questioned the defendant, whom they believed to be a murder suspect, at his home about an unrelated robbery. The defendant accompanied the plainclothes detectives to the police station, where they interrogated him in a closed room. Id., 754. The detectives initially questioned the defendant about the unrelated robbery and advised the defendant of his *Miranda* rights only when the questioning turned to the murder case. Id. The defendant waived his rights and continued to answer the detectives' questions. Id. Prior to trial, the defendant moved to suppress all of his statements. Id., 755. "Noting that the defendant voluntarily had gone to the police station, that he had not been handcuffed or arrested, and that he had been free to leave at any time, we stated that the concerns of *Miranda* are not implicated in this case. . . . Accordingly, we held that a reasonable person in the defendant's situation would not have believed that his movement was restricted to a degree that is associated with a formal arrest . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Turner,* supra, 267 Conn. 438.

Additionally, in *State* v. *Northrop,* supra, 213 Conn. 408, 414, this court reviewed a similar factual situation in which a defendant, accompanied by his aunt, was picked up by police, taken to the police station, and returned home after a police interview. In *Northrop,* this court deemed the following facts important: "[The defendant] . . . acknowledged that he had been told that he was not under arrest and that he could stop answering questions and leave at any time. Those acknowledgments coupled with the circumstance that,

after giving an exculpatory statement, the defendant and his aunt were, in fact, driven home, lends strong support to the trial court's implicit finding that the defendant was not in custody at New Haven police headquarters." Id., 414–15; see also *State* v. *Lapointe*, 237 Conn. 694, 726, 678 A.2d 942 ("[g]iven the defendant's freedom of movement about the police station and the fact that he had been repeatedly told that he was free to leave, we conclude that the defendant was not in custody"), cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996); *State* v. *Greenfield*, supra, 228 Conn. 71 n.10 ("an important factor distinguishing a consensual encounter from a seizure is whether the police expressly informed the defendant that he was free to leave at the outset of the interview").

The present case is legally indistinguishable from those discussed herein. The defendant accompanied the detectives to the police station voluntarily; he was not handcuffed or subjected to force; he was told repeatedly that he was not under arrest and that he could leave at any time; and he was driven home after the interview concluded.

Because the facts in the record support the trial court's determination that a reasonable person in the defendant's position would not have believed that he was in custody, we agree with the trial court that the defendant was not required to be given *Miranda* warnings. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress.

## II

The defendant next claims that the trial court improperly instructed the jury with regard to the defendant's possible eligibility for the death penalty. In particular, the defendant claims that the trial court improperly read the specific statutory aggravating factor to the potential jurors during voir dire that the state would

be seeking to prove if the jury were called upon to decide whether the defendant should be sentenced to death. According to the defendant, the trial court deprived him of a fair trial by including in its preliminary jury instruction a statement of the aggravating factor under General Statutes § 53a-46a (i) (1), i.e., that the defendant previously had been convicted of the same felony that was charged in this case. We decline to review this unpreserved claim.

The following additional facts are relevant to our disposition of this claim. The trial court gave the panel of prospective jurors preliminary instructions prior to individual voir dire. Because the state charged the defendant in the first count of the information with capital felony, the trial court included an explanation of the bifurcated trial system used in death penalty cases. The trial court explained: "Now, this is a hypothetical discussion at this point because the defendant is presumed to be innocent of any wrongdoing whatsoever. And the jury must respect that presumption of innocence. If, and only if, the presumption of innocence is overcome by proof beyond a reasonable doubt as to the crime of capital felony as charged here, then the same jury that delivers the unanimous verdict of guilty to capital felony, and that verdict is based on the evidence without regard to punishment, then that jury will proceed with a second stage called the penalty phase hearing." The trial court further explained that in a penalty phase hearing, both aggravating and mitigating factors would be outlined for the jury's consideration. In the course of that instruction, the trial court included the following explanation: "In this case, the state has alleged two aggravating factors as set forth in [§] 53a-46a (i). One, the defendant committed the crime of capital felony in an especially heinous, cruel and depraved manner. And two, the defendant committed the offense during the commission or attempted com-

mission of or during the immediate flight from the commission or attempted commission of a felony and he had previously been convicted of the same felony. The state will have the burden of proving either or both of these alleged aggravating factors beyond a reasonable doubt." The defendant did not take exception to the charge as given, nor did the defendant request that this part of the charge not be given. The defendant subsequently was acquitted by the jury of the capital felony charge and the jury therefore never proceeded to a penalty phase hearing.

Practice Book § 42-16 provides in relevant part: "An appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of exception. . . ." This court previously has explained that "[t]he purpose of the rule is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials." *State* v. *Packard*, 184 Conn. 258, 281, 439 A.2d 983 (1981); see also *Henderson* v. *Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977) ("[o]rderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error").

In the present case, it is undisputed that the defendant failed to comply with Practice Book § 42-16 at trial. The defendant now seeks to prevail on appeal under: (1) the doctrine enunciated in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); (2) the plain error doctrine, as codified in Practice Book § 60-5; or (3) the

exercise of our supervisory power, pursuant to Practice Book § 60-2. Although we agree with the defendant that trial courts should refrain from reading aggravating factors to jurors in preliminary instructions during the guilt phase of a trial when the aggravating factor consists of a prior felony conviction under § 53a-46a (i) (1), we decline to review the defendant's claim.

It is well established that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40. "The first two steps in the *Golding* analysis address the reviewability of the claim, while the last two steps involve the merits of the claim." (Internal quotation marks omitted.) *State* v. *Andresen*, 256 Conn. 313, 325, 773 A.2d 328 (2001). "The appellate tribunal is free . . . to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." *State* v. *Golding*, supra, 240.

Although the record in the present case is adequate for review, the defendant's claim regarding the court's instruction is not of constitutional magnitude, as it does not allege the violation of a fundamental right. The defendant claims that we should look to *State* v. *Jones*, 234 Conn. 324, 662 A.2d 1199 (1995), and *State* v. *Ferrone*, 96 Conn. 160, 113 A.2d 452 (1921), cases in which this court determined that a two part information is required under our rules of practice whenever the state

seeks an enhanced penalty. In *Ferrone*, this court concluded that "until the verdict of the jury on the principal issue has been rendered, no knowledge of the alleged previous convictions should reach them, either by reading that part of the information in which they are recited, or by evidence relating to them." *State* v. *Ferrone*, supra, 174–75. Relying on *Ferrone*, this court stated at the outset in *State* v. *Jones*, supra, 337–38, that "if proof of a defendant's prior conviction is used to enhance the punishment for a contemporaneous conviction of a substantive offense, the state must file a two part information. . . . This procedure is used when the state charges a defendant as a persistent offender." (Citations omitted.) The defendant claims that under *Ferrone* and *Jones*, the alleged aggravating factor should not have been read to the jury prior to the penalty phase of a bifurcated capital felony trial. Although we agree with the defendant that trial courts should indeed refrain from reading such an aggravating factor to jurors in preliminary instructions during the guilt phase of a trial, neither *Jones* nor *Ferrone*, however, implicated the defendants' constitutional rights, and, therefore, these cases provide no support for the defendant's claim for *Golding* review.

Moreover, the United States Supreme Court, which referred to *Ferrone* in *Spencer* v. *Texas*, 385 U.S. 554, 567–68, 87 S. Ct. 648, 17 L. Ed. 2d 606, reh. denied, 386 U.S. 969, 87 S. Ct. 1015, 18 L. Ed. 2d 125 (1967), has suggested that the bifurcation is not based on a federal constitutional right. In *Spencer*, the Supreme Court discussed the procedures used by various states in trying habitual criminals. Id., 566–67. In dicta, the *Spencer* court indicated that the procedure utilized in our jurisdiction was probably the fairest and best recidivist trial procedure in the country. Id., 567–68. The *Spencer* court, however, also noted that "[t]o say that the two-stage jury trial in the English-Connecticut style is proba-

bly the fairest, as some commentators and courts have suggested . . . is a far cry from a constitutional determination that this method of handling the problem is compelled by the [f]ourteenth [a]mendment." Id. In light of this statement in *Spencer*, we are not persuaded that the defendant's unpreserved claim is of constitutional magnitude. Thus, the defendant cannot satisfy the second prong of *Golding*.

The defendant also seeks review under the plain error doctrine. The plain error doctrine is based on Practice Book § 60-5, which provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." "The plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under [the] plain error [doctrine] unless [he] has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *D'Antonio*, 274 Conn. 658, 669, 877 A.2d 696 (2005). The defendant's claim is not of constitutional magnitude, however, and he has failed to explain why the claim merits the extraordinary remedy of plain error review. We therefore decline his invitation to consider it.

The defendant also requests that this court exercise its supervisory powers to review this claim. "Our supervisory powers . . . are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks

omitted.) *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998).

In the present case, after instructing the jury on the two specific aggravating factors alleged by the state, the court immediately impressed upon the prospective jurors that the state was required to bear the burden of proving both of the alleged aggravating factors beyond a reasonable doubt. Additionally, the instruction at issue was given only once, and at the conclusion of the instruction, the trial court emphasized that its explanation of the penalty phase of a death penalty case was a "hypothetical discussion because the presumption of innocence is fully in place and will remain so unless and until the defendant is convicted of the crime of capital felony." The jury thereafter acquitted the defendant of capital felony. We cannot conclude that the trial court jeopardized the integrity of the trial and the fairness of our judicial system as a whole under these circumstances. We therefore decline to exercise our supervisory powers.

The judgment is affirmed.

In this opinion the other justices concurred.

---

* The listing of justices reflects their seniority status as of the date of oral argument.