ABIN BRITTON *v.* COMMISSIONER OF CORRECTION
(AC 32908)

Gruendel, Beach and Alvord, Js.

Argued January 7—officially released April 2, 2013

*Deren Manasevit,* assigned counsel, for the appel-
lant (petitioner).

*Michael L. Regan,* state's attorney, for the appellee (respondent).

GRUENDEL, J. The petitioner, Abin Britton, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner claims that the court erred in finding that his trial counsel did not render ineffective assistance with respect to his attorneys' (1) advice regarding the state's plea offer, (2) failure to offer the petitioner's testimony at a suppression hearing and (3) failure to object to the trial court's instructions to the venire panel. We dismiss the petitioner's appeal.

The record reveals the following facts and procedural history. In the early hours of August 23, 1998, at approximately 1:30 a.m., the petitioner, along with Gregory Pierre and Jeffrey Smith, met the victim, James Connor, at Lucky's Café (Lucky's), located near the Essex Marina. *State* v. *Britton,* 283 Conn. 598, 601, 929 A.2d 312 (2007). The victim wanted to purchase crack cocaine, and after the petitioner told the victim that he would be able to get the cocaine, the four men left the bar to conduct the drug transaction. Id.

"The victim bought two small bags of crack cocaine in exchange for $20, and he and the [petitioner], with Pierre and Smith following in a separate vehicle, drove to Pierre's apartment complex in New London so that the victim could use the drugs he had just purchased. Once they arrived at the apartment complex, Pierre, Smith and the [petitioner] pulled the victim out of the [victim's] Saab and beat him. When this attack ceased, the victim was badly injured but still alive. The three men then put the victim into the backseat of the Saab and brought him to a nearby parking lot abutting Bates Woods, a park in New London. They pulled the victim

out of the car once more, and this time beat him to death. Pierre, Smith and the [petitioner] then dragged the victim's body into Bates Woods, where they covered the body with dirt and plastic bags. The [petitioner] disposed of the victim's Saab by pushing it into a small pond behind the Waterford police department." Id., 601–602.

At approximately 6:30 a.m. on that day, Harrison Fortier, a Waterford police sergeant, discovered the victim's car, which was registered to his father, partially submerged in the duck pond behind the police station. Id., 602. "Upon looking inside the car, Fortier noticed red stains, which led him to believe that someone may have been injured inside. . . . Police also found two palm prints on the outside of the vehicle, which were later identified as matching the [petitioner's] palms." Id.

"In January, 1999, a badly decomposed body was found in Bates Woods. Harold Wayne Carver II, chief medical examiner for the state, examined the remains and identified them as belonging to the victim. Carver classified the manner of death as a homicide.

"In the course of their investigation, the police developed a list of three suspects—Pierre, Smith and the [petitioner]—who they believed were responsible for the victim's death. Detectives Thomas Murray of the Connecticut state police and Rod Gaynor of the New London police department visited one of these suspects, the [petitioner], in order to obtain his palm prints. Murray and Gaynor went to the [petitioner's] home and asked him to accompany them to the police station, where they took his palm prints and then turned him over to Detectives James McGlynn of the Connecticut state police and David Gigliotti of the New London police department for questioning. . . . The [petitioner] gave a statement while at the police station describing his involvement in the victim's death and

also drew a diagram of where he said the victim's body was located." Id., 602–603.

The petitioner was, thereafter, arrested and charged with crimes in connection with the victim's death. "The [petitioner] filed a pretrial motion to suppress both his statements and the diagram he had drawn for the police. The [petitioner] claimed that the statements and the map had been procured in the course of a custodial interrogation, but without the necessary *Miranda*[1] warnings having been given to him. After a hearing, the trial court denied the [petitioner's] motion to suppress." Id., 603.

Following a jury trial, the petitioner was convicted of one count of felony murder in violation of General Statutes § 53a-54c, one count of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1), two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and (B), and one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (1).[2] The court, thereafter, merged the manslaughter conviction with the felony murder conviction, rendered judgment in accordance with the verdict and sentenced the petitioner to a total effective term of eighty-five years incarceration.

The petitioner appealed directly to the Supreme Court, claiming that the trial court (1) "improperly denied his motion to suppress certain statements he made to police based on the court's conclusion that the [petitioner] was not in custody and therefore could give police a statement regarding his involvement in the

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] Reading the state's information, entered into evidence as petitioner's exhibit 1, together with the judgment file, entered as petitioner's exhibit 2, we are able to glean that the petitioner was so convicted. Both parties' representations to the habeas court and this court comport with this reading.

murder of the victim . . . without having been given *Miranda* warnings," and (2) "deprived him of a fair trial and impartial jury by explaining to the jury that if the [petitioner] were found guilty of capital felony, during the penalty phase, the jury would hear evidence regarding the aggravating factor set forth in General Statutes § 53a-46a (i) (1), that is, that the offense charged had occurred during the commission of a felony and that the [petitioner] previously had been convicted of the same felony." Id., 600–601. Affirming the judgment of the trial court, the Supreme Court determined that the trial court had not erred in denying the petitioner's motion to suppress his statements to police, as the petitioner had not proven that "he was subject to custodial interrogation for *Miranda* purposes"; id., 606; and that his second claim, which had not been properly preserved, was not reviewable. Id., 613.

Thereafter, the petitioner filed a petition for a writ of habeas corpus, alleging, inter alia, that his trial counsel had rendered ineffective assistance by failing to (1) adequately advise him regarding a plea offer, (2) offer the petitioner's testimony on the circumstances of his giving a statement to police about his involvement in the victim's death and (3) object to the trial court's preliminary instructions to the venire panel. After a trial, the habeas court denied the petition, finding that the petitioner had not met his burden of demonstrating that his trial counsels' assistance was ineffective or that he was prejudiced thereby. The habeas court subsequently denied the petition for certification, and this appeal followed.

"Faced with the habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the [denial] of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn.

178, 640 A.2d 601 (1994) . . . . First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must prove that the decision of the habeas court should be reversed on the merits. . . .

"To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . .

"Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Citations omitted; internal quotation marks omitted.) *Wright* v. *Commissioner of Correction*, 111 Conn. App. 179, 181–83, 958 A.2d 225 (2008), cert. denied, 290 Conn. 904, 962 A.2d 796 (2009).

"[I]n order to determine whether the petitioner has demonstrated ineffective assistance of counsel, we apply the two part test enunciated by the United States Supreme Court in *Strickland* [v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] . . . . In *Strickland* . . . the United States Supreme Court determined that the claim must be supported by evidence establishing that (1) counsel's representation fell below an objective standard of reasonableness, *and* (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different

had it not been for the deficient performance. . . . The first prong requires a showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the [s]ixth [a]mendment." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 575–76, 941 A.2d 248 (2008).

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice . . . are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. . . .

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting . . . to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) Id., 577.

We note further that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. . . . To satisfy the second prong of *Strickland*, that his counsel's deficient performance prejudiced his defense, the petitioner must establish that, as a result of his trial counsel's deficient performance, there remains a probability sufficient to undermine confidence in the verdict that resulted in his appeal. . . . The second prong is thus satisfied if the petitioner can demonstrate that there is a reasonable probability that, but for that ineffectiveness, the outcome would have been different." (Citations omitted; internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 522, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009).

Moreover, "[a] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [petitioner] as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Internal quotation marks omitted.) *Holley* v. *Commissioner of Correction*, 62 Conn. App. 170, 174, 774 A.2d 148 (2001).

I

PLEA OFFER

We address first the petitioner's claim that the habeas court erred in finding that the petitioner's trial counsel did not render ineffective assistance of counsel by virtue of their advice regarding a plea offer from the state. We agree with the habeas court's finding that the petitioner did not suffer prejudice as a result of his attorneys' performance, and, therefore, conclude that the

habeas court did not abuse its discretion in denying the petition for certification to appeal.

The following additional facts, gleaned from transcripts of the habeas trial, are relevant to the resolution of the petitioner's first claim. Before trial, when the petitioner was represented by counsel different from the attorneys who tried his criminal case, the petitioner rejected, on the record in open court, a plea offer from the state that would have required that he plead guilty to felony murder in exchange for a sentence of fifty-five years imprisonment, with the opportunity to argue for less. Despite his rejection of the offer, it remained open until the time of trial. At the habeas trial, both of the attorneys who represented the petitioner during his criminal trial, Kevin Barrs and M. Fred DeCaprio, testified regarding their advice to the petitioner with respect to the plea offer. Barrs testified that he met with the petitioner approximately one week before the trial began to discuss, among other things, the plea offer, and that the petitioner's mother accompanied him to the meeting in order to encourage the petitioner to accept it. Given that the sentence of fifty-five years was such a long prison term, Barrs testified that he did not deem it appropriate to affirmatively recommend the sentence. He testified instead that he explained the relative costs and benefits of the plea offer and then left it to the petitioner to decide whether he should accept it. The petitioner, who also testified at the habeas trial, did not say that he would have taken the plea offer had his attorneys recommended that he do so. Rather, as found by the habeas court, "He stated . . . that he did not want an offer; he wanted a trial."

"In [*Lafler* v. *Cooper*,      U.S.    , 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012), and *Missouri* v. *Frye*,      U.S.    , 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012)], the United States Supreme Court held that habeas petitioners can establish a violation of the sixth amendment right to counsel by proving a reasonable probability [that] they

would have accepted the . . . plea offer had they been afforded effective assistance of counsel." (Internal quotation marks omitted.) *Ebron* v. *Commissioner of Correction*, 307 Conn. 342, 349, 53 A.3d 983 (2012), cert. denied sub nom. *Arnone* v. *Ebron*,     U.S.     133 S. Ct. 1726, 185 L. Ed. 2d 802 (2013). "[T]o satisfy the prejudice prong of the *Strickland* test when the ineffective advice of counsel has led a defendant to reject a plea offer, the habeas petitioner must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." (Internal quotation marks omitted.) Id., 352.

Given that the petitioner presented no evidence that he would have accepted the state's plea offer, and, in fact, testified that he affirmatively wanted to go to trial, the petitioner suffered no prejudice as a result of his attorneys' advice to him regarding the offer. The testimony proffered by the petitioner, that he was unwilling to accept a plea because he wanted a trial, does not support a determination that in the absence of his attorneys' alleged ineffective assistance, there is a reasonable probability that he would have accepted the offer. Accordingly, we conclude that the habeas court did not err in finding that the petitioner did not receive ineffective assistance of counsel, and, therefore, did not abuse its discretion in denying the petitioner certification to appeal.

## II

### SUPPRESSION HEARING

We address next the petitioner's claim that the habeas court improperly found that his trial counsel had not

rendered ineffective assistance by failing to offer his testimony during the hearing on the motion to suppress both the statements and sketch he provided to police. Because the petitioner has not shown that he was prejudiced by his attorneys' decision, the habeas court did not abuse its discretion in denying the petitioner certification to appeal.

The following additional facts are based on the evidence adduced during the suppression hearing before the trial court, as set forth by our Supreme Court, and on the evidence presented during the habeas trial. "Dressed in plain clothes, Detectives Murray and Gaynor drove to the [petitioner's] home and asked the [petitioner] to accompany them to the New London police station on February 10, 1999. . . . [T]he detectives remained at the threshold of the apartment. Murray and Gaynor did not show any force or draw their weapons. The two detectives informed the [petitioner] that he was not under arrest and that they would drive him back to his home when they were finished collecting his palm prints. The [petitioner] received a telephone call before he left, and the detectives waited while the [petitioner] took the call. After completing his call, the [petitioner], who was not handcuffed, rode in the front seat of Gaynor's car while Murray sat in the back. Murray testified that he and Gaynor did not have an arrest warrant for the [petitioner] and that he had explained to the [petitioner] that he was not compelled to accompany them to the police station, but could instead refuse their invitation.

"Upon arriving at the police station, Murray and Gaynor parked behind the station, and all three men entered through the rear private entrance. Once inside the police station, Murray and Gaynor obtained the [petitioner's] palm prints in a small office that was 'used for administrative purposes. . . .' The [petitioner] signed a consent to search form advising him that the

detectives wanted to take his palm prints and informing him of his right to refuse the search. Murray described the [petitioner] as 'suspicious of police and a little nervous . . . but he was cooperative and didn't ask to leave.'

"After taking the [petitioner's] palm prints, Murray and Gaynor left and were replaced by Detectives McGlynn and Gigliotti, who both interviewed the [petitioner]. McGlynn testified that the [petitioner] was not handcuffed during the interview, that the door to the office remained unlocked, and that the [petitioner] never was told that he was under arrest. Rather, McGlynn and Gigliotti repeatedly told the [petitioner] that he was free to leave throughout the interview. McGlynn also told the [petitioner] that he did not have to answer any of the detectives' questions. Describing the interview with the [petitioner], McGlynn testified that it was conversational in nature. During the course of the interview, the [petitioner] changed his story several times; however, once the story became consistent, McGlynn and Gigliotti asked the [petitioner] if he would be willing to put his statement in writing. The [petitioner] agreed and signed all six pages of the statement.

"According to McGlynn, the interview was conducted around lunchtime, and the [petitioner] declined the food he was offered, but accepted a soda. The [petitioner] also was permitted to use the bathroom at the police station; he was escorted to it but not followed inside. At one point during the interview, the [petitioner] expressed concern that his daughter would return from school and that he would not be there to pick her up. In response, McGlynn reassured the [petitioner] that he and Gigliotti would give the [petitioner] a ride home.

"Although the [petitioner] initially was polite and calm, McGlynn testified that the [petitioner] became agitated when Sergeant Paul Heon of the Connecticut

state police, McGlynn's immediate supervisor, questioned the veracity of the [petitioner's] written statement. In response to Heon's accusation, the [petitioner] became upset and tore his statement into four pieces. The [petitioner] eventually calmed down, and apologized for tearing up his statement. McGlynn and Gigliotti thereafter asked if the [petitioner] would be willing to draw a diagram of where the victim was buried in Bates Woods, and he complied with the request. McGlynn testified that the diagram detailed the park, the driveway connecting the road to the parking lot abutting the park, and the hill where the [petitioner] claimed the victim's body was located. Shortly after the [petitioner] completed the diagram, McGlynn and Gigliotti drove him home. The [petitioner] had spent nearly six and one-half hours at the police department, and the interview had lasted approximately five hours.

"The [petitioner] filed a pretrial motion seeking to suppress all of the statements that he had made to the police, claiming that they were obtained in violation of his rights under the fourth, fifth, sixth and fourteenth amendments to the United States constitution, and article first, §§ 7, 8 and 9, of the Connecticut constitution. In his motion, the [petitioner] asserted that, when he had made the statements at issue, he was in police custody and had not yet received *Miranda* warnings. Accordingly, the [petitioner] claimed that both his statements and the diagram he drew for police should be suppressed.

"After a hearing, the trial court denied the [petitioner's] motion to suppress. In its oral decision on the record, the trial court found that the [petitioner] had not been in custody and therefore was not entitled to *Miranda* warnings when he was questioned by police. The trial court credited the detectives' testimony that the [petitioner] never had been handcuffed and that no force had been used against him. Furthermore, although

the door to the room where the [petitioner] was interviewed had remained closed, there was no evidence that the door had been locked. The trial court further found that the [petitioner] repeatedly had been told that he could leave, noting that 'Gaynor told [the petitioner] not only that he wasn't under arrest but that he could leave at any time,' and '[t]he court [likewise] credit[ed] the testimony of [McGlynn and Gigliotti] . . . that [the petitioner] was initially told that he was not under arrest and that he could leave at any time . . . .' " *State* v. *Britton,* supra, 283 Conn. 606–609.

Our Supreme Court ultimately determined that the trial court had properly denied the petitioner's motion to suppress the statements and the sketch, as the trial court had correctly found that the petitioner was not in custody for purposes of triggering his *Miranda* rights. As the Supreme Court explained: "The [petitioner] accompanied the detectives to the police station voluntarily; he was not handcuffed or subjected to force; he was told repeatedly that he was not under arrest and that he could leave at any time; and he was driven home after the interview concluded. Because the facts in the record support the trial court's determination that a reasonable person in the [petitioner's] position would not have believed that he was in custody, we agree with the trial court that the [petitioner] was not required to be given *Miranda* warnings." Id., 612.

At the habeas trial, the petitioner testified about the circumstances surrounding his providing statements to police. The petitioner testified that, on the morning he made the statements, the police came to his home and requested that he go with them to the police station. According to his testimony, the petitioner was not handcuffed or placed under arrest, nor was he transported to the police station in a squad car. The petitioner testified that upon his arrival at the police station, he was escorted to an office with windows, where he signed

a consent form giving permission to the police to take his palm prints. Consistent with the testimony of McGlynn at the suppression hearing, the petitioner testified that he was allowed to use the bathroom unaccompanied by a police officer. He also testified that after allowing the police to take his palm prints, he gave them a statement discussing the victim's death. He, according to his testimony, tore up the statement after one of the detectives challenged its truth because the police had told him he was not then able to leave the station. The petitioner also testified that at some point before he tore up his statement, the police asked him to draw two lines on a piece of paper, but that he did not draw the sketch of the location where the victim's body was buried. On cross-examination, the petitioner also testified that he was familiar with the arrest process and his *Miranda* right to silence and that he was aware that once arrested, the police are not required to ask for permission to take fingerprints.

In issuing its decision, the habeas court found that even if the petitioner had testified at the suppression hearing exactly as he had at the habeas trial, the trial court would not have granted the motion to suppress the statements. The court did find, in light of the petitioner's experience of having been in police custody before and having a criminal record, that the trial court likely would not have found his testimony about the events more credible than that of the detectives who testified at the hearing. On the basis of these determinations, the court found, inter alia, that the petitioner was not prejudiced by his attorneys' decision not to offer his testimony during the hearing on the motion to suppress because his testimony would not have affected the trial court's ruling on the motion.

We agree with the habeas court's finding that the petitioner was not prejudiced by his attorneys' decision

against offering his testimony at the suppression hearing. As the court explained, the petitioner has not shown that the scant additional evidence that he would have offered had he testified, which was unlikely to be credited by the trial court, would have altered the trial court's ruling on the motion to suppress. The petitioner's testimony did not establish any credible new or additional factual bases for a court to find that he was in custody for purposes of triggering his *Miranda* rights. Thus, that the petitioner was not prejudiced by his attorneys' failure to offer his testimony at the suppression hearing is not debatable among jurists of reason, could not reasonably be resolved differently, nor does this issue present questions adequate to deserve encouragement to proceed further. Accordingly, we conclude that, in denying the petitioner certification to appeal, the habeas court did not abuse its discretion.

## III

### INSTRUCTIONS TO VENIRE PANEL

Finally, we turn to the petitioner's claim that the habeas court erroneously found that his trial counsel did not render ineffective assistance in failing to object to the trial court's instructions to the venire panel. Specifically, the petitioner argues that his attorneys' assistance was ineffective because they failed to object to the trial court's mentioning of his prior felony conviction while giving its preliminary instructions during jury selection. We conclude that the petitioner has not shown that his trial counsel provided professionally unreasonable assistance, and, thus, the habeas court did not abuse its discretion in denying his petition for certification to appeal.

"The trial court gave the panel of prospective jurors preliminary instructions prior to individual voir dire. Because the state charged the [petitioner] in the first count of the information with capital felony, the trial

court included an explanation of the bifurcated trial system used in death penalty cases. The trial court explained: 'Now, this is a hypothetical discussion at this point because the [petitioner] is presumed to be innocent of any wrongdoing whatsoever. And the jury must respect that presumption of innocence. If, and only if, the presumption of innocence is overcome by proof beyond a reasonable doubt as to the crime of capital felony as charged here, then the same jury that delivers the unanimous verdict of guilty to capital felony, and that verdict is based on the evidence without regard to punishment, then that jury will proceed with a second stage called the penalty phase hearing.' The trial court further explained that in a penalty phase hearing, both aggravating and mitigating factors would be outlined for the jury's consideration. In the course of that instruction, the trial court included the following explanation: 'In this case, the state has alleged two aggravating factors as set forth in [§] 53a-46a (i). One, the [petitioner] committed the crime of capital felony in an especially heinous, cruel and depraved manner. And two, the [petitioner] committed the offense during the commission or attempted commission of or during the immediate flight from the commission or attempted commission of a felony and he had previously been convicted of the same felony. The state will have the burden of proving either or both of these alleged aggravating factors beyond a reasonable doubt.' " Id., 613–14.

At the habeas trial, DeCaprio testified that he objected to the trial court's instructions in chambers and off the record, but the trial court nevertheless intended to include reference to the petitioner's felony conviction in its instructions to the venire panel. DeCaprio, according to his testimony, succeeded in persuading the trial court to "water down" the instructions. DeCaprio also testified that he decided to pursue the issue of the instruction informally in chambers, rather

than by arguing on the record, because he believed he was likely to be unsuccessful, as there was no case law on this subject at the time of the petitioner's trial, but that, in fact the law on this subject was developed through the petitioner's direct appeal to our Supreme Court.[3] The habeas court credited DeCaprio's testimony regarding his handling of the trial court's instructions.

Given that the petitioner's trial counsel discussed the matter of the instructions with the trial court, voiced an objection to the mentioning of the petitioner's prior felony conviction and succeeded in persuading the court to revise its intended instructions in a way favorable to the petitioner, we do not conclude that his attorneys' strategy did not fall within the ambit of sound and reasonable assistance. Moreover, in light of the posture of Connecticut law on this issue at the time of the petitioner's trial, the record indicates that his attorneys' method of addressing the trial court's instructions surpassed any "standard of reasonableness . . . ." *Johnson* v. *Commissioner of Correction*, supra, 285 Conn. 575. To fault the petitioner's trial counsel for not having the clairvoyance to predict the development of the law relating to jury instructions in capital felony cases would be to allow "second-guess[ing]" and the "distorting effects of hindsight" to infect the evaluation of trial counsels' performance, precisely the type of critique our Supreme Court has cautioned against. Id., 577. We, accordingly, conclude that this issue is not debatable among jurists of reason, that a court could

[3] The Supreme Court, in its decision on the petitioner's direct appeal, stated that it "agree[d] with the [petitioner] that trial courts should refrain from reading aggravating factors to jurors in preliminary instructions during the guilt phase of a trial when the aggravating factor consists of a prior felony conviction . . . ." *State* v. *Britton*, supra, 283 Conn. 615. As the petitioner's claim was not properly preserved, however, and did not satisfy the conditions for review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), the Supreme Court declined to afford it review. *State* v. *Britton*, supra, 617.

not resolve it differently, and that it does not present questions deserving encouragement to proceed further. Thus, the habeas court did not abuse its discretion in denying the petitioner certification to appeal.

The appeal is dismissed.

In this opinion the other judges concurred.

