STATE OF CONNECTICUT *v.* RAYMOND BRIDGES
(AC 30378)

DiPentima, C. J., and Harper and Schaller, Js.

Argued September 16—officially released November 16, 2010

*Neal Cone*, senior assistant public defender, for the appellant (defendant).

*Amanda E. Gordon*, certified legal intern, with whom were *Michele C. Lukban*, senior assistant state's attorney, and, on the brief, *John C. Smriga*, state's attorney, and *Marc R. Durso*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Raymond Bridges, appeals from the judgment of conviction, rendered following a jury trial, of burglary in the third degree in violation of General Statutes § 53a-103 (a) and larceny in the third degree in violation of General Statutes § 53a-124 (a) (2).[1] The sole claim raised in this appeal is that the court improperly denied the defendant's motion to suppress certain evidence. We affirm the judgment of the trial court.

On June 30, 2008, following his arrest, the defendant filed a motion to suppress "any and all statements which [he] may have made to law enforcement personnel, on or after September 4, 2007, together with any and all evidence which the [s]tate may subsequently have accumulated by the exploitation of such statements and/or information related therein." By way of the motion to suppress, as well as argument related thereto, the defendant asserted that, on September 4, 2007, the police had subjected him to a custodial interrogation, during which he was questioned about a burglary that had occurred in Bridgeport on August 29, 2007. The defendant argued that the police had not provided him with *Miranda*[2] warnings prior to the interrogation and that

---

[1] Additionally, the defendant pleaded guilty to being a persistent serious felony offender under General Statutes § 53a-40 (c), as alleged in a part B information. The court imposed a total effective sentence of sixteen years incarceration.

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

his statements to the police concerning the crime were not voluntary but the fruit of an unlawful interrogation under the state and federal constitutions.[3]

In July, 2008, the court conducted an evidentiary hearing on the defendant's motion. At the hearing, the state and the defendant presented evidence. On July 14, 2008, in a memorandum of decision, the court denied the motion to suppress. In its decision, the court set forth the following findings of fact: "The evidence produced at the hearing consisted of the testimony of Bridgeport police Officer Daniel Gomez, Detectives Eric King and Alex Ruiz and the defendant. Among the evidence introduced at the hearing were copies of the still photographs taken from the surveillance video that were shown to the defendant during the questioning on September 4, 2007.

"Testimony from the police established that a burglary and larceny occurred at . . . a restaurant located in downtown Bridgeport on August 29, 2007. As a result of the investigation, burglary detectives distributed to downtown patrol officers copies of a photograph made from a surveillance video that depicted a suspect seen inside the restaurant. On September 4, 2007, Officer Gomez was patrolling the downtown area on a Segway [personal transportation device] when he observed the defendant, whom he believed to fit the description of the suspect in the photograph. Gomez contacted the detectives, maintained observation of the defendant and followed him until the detectives arrived.

"Responding Detectives King and Ruiz arrived in an unmarked detective bureau vehicle, which has no cage

---

[3] The court's analysis appears to be based on the federal constitution, and, on appeal, the defendant has not separately analyzed his claim under the state constitution. Accordingly, we review the present claim under the federal constitution. See, e.g., *State* v. *Dyson*, 238 Conn. 784, 794, 680 A.2d 1306 (1996) ("[b]ecause the defendant has failed to provide any independent analysis under the state constitution, we limit our analysis to the federal constitution").

separating the front and backseats, and has back doors that can be opened by a passenger. Once the detectives arrived, King spoke with the defendant and informed him that he fit the description of an individual [who had] gained entry into [the restaurant] and that he was a suspect. King then asked the defendant if he would be willing to come into police headquarters to talk with them, and the defendant agreed. The defendant got into the backseat of the detectives' car and proceeded to the city hall annex to speak with the detectives. He was not in handcuffs upon King's and Ruiz' arrival, and was never placed [in] handcuffs by the detectives. During the car ride from Main Street and Wells [Street] to the city hall annex on Broad Street, King advised the defendant on several occasions that he was not under arrest and was free to leave at any time. The defendant did not tell the detectives that he wanted to leave.

"King, Ruiz and the defendant walked to an interview room. The door to the room was open and remained open during the time the defendant was with the detectives. King again explained to the defendant that he was a suspect in the burglary of the restaurant and asked the defendant if he could take some photographs of him, and the defendant agreed. After that, King produced four photographs that had been taken from the surveillance video of the person inside [the restaurant]. After [observing] photographs one, two and three, the defendant agreed that he was the person [depicted] in the photograph[s]. At photograph four, a photograph depicting the individual with cash being put into [his] pocket, the defendant denied that it was a photograph of him. After some further questioning, the defendant maintained that photograph number four was not him, and he stated that he wanted to leave.

"Before the defendant left the interview room, King explained that he had sufficient information to obtain an arrest warrant for the defendant. The defendant gave

King his cell phone number so that King could call him when the warrant was issued. The cell phone number appears on the first photograph shown to the defendant, state's exhibit number ten. The defendant then left the interview room after declining a ride to Main Street and Wells [Street].

"The defendant's version of the events of September 4, 2007, differed markedly from that of the police. In short, the defendant claimed that from the moment he encountered the police on Main Street, he was thrown down to the ground, handcuffed, taken to the city hall annex, photographed and then released. The defendant testified that, until he was released, he believed that he was under arrest. Although he admitted that on the prior times he had been arrested by the police he was fingerprinted and had mug shots taken, he acknowledged that such police activity did not occur on that day. He also admitted that it was in fact his cell phone number on state's exhibit ten. The defendant's version of events was simply not credible."

Thereafter, the court stated that the issue before it was whether the defendant was in police custody on September 4, 2007, and, thus, was entitled to *Miranda* warnings during his encounter with the police. After setting forth the legal principles that guided its analysis, the court reasoned: "The more credible evidence establishes that the defendant was not in custody on September 4, 2007. The defendant was never in handcuffs, was told repeatedly that he was free to leave, was in a room with the door open during the questioning and [was] permitted to leave when he so requested. The defendant went to the city hall annex with the police voluntarily and gave them his cell phone number. The defendant left the police after telling them he no longer wanted to answer their questions. No reasonable person in the defendant's position on September 4, 2007, would believe that he was in police custody." In its analysis,

the court relied heavily on the fact that the defendant had not been handcuffed and was told that he was free to leave and that he was not under arrest. Thereafter, the court denied the motion to suppress after concluding that the defendant had failed to demonstrate that he was in police custody and, thus, entitled to *Miranda* warnings.

"It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . The defendant bears the burden of proving that he was in custody for *Miranda* purposes. . . .

"A defendant in custody is subject to interrogation not only in the face of express questioning by police but also when subjected to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . Whether a defendant in custody is subject to interrogation necessarily involves determining first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that such conduct is reasonably likely to elicit an incriminating response. . . .

"As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view

of the evidence and pleadings in the whole record . . . . As we have noted previously, however, when a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . .

"The question of whether a defendant is in custody for purposes of a custodial interrogation involves a two step inquiry. The trial court first makes a factual determination of the circumstances surrounding the alleged interrogation and then applies those facts to an objective test as to whether a reasonable person would have felt that he or she was not at liberty to leave. . . . The first inquiry is factual and will not be overturned unless, after a scrupulous examination of the record, we find that it is clearly erroneous. . . . The second question calls for application of the controlling legal standard to the historical facts [which is a question of law]. . . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo." (Citations omitted; internal quotation marks omitted.) *State* v. *Mullins*, 288 Conn. 345, 361–63, 952 A.2d 784 (2008).

The defendant claims, on the basis of the historical facts found by the trial court, that it improperly concluded that, on September 4, 2007, he was not entitled to the warnings constitutionally required by *Miranda*

because he was not in police custody during the interrogation that occurred on that date. The defendant does not argue that the court's findings of fact concerning what transpired on September 4, 2007, were clearly erroneous. Although the court did not explicitly address these issues in its memorandum of decision, the state appeared to agree at the conclusion of the suppression hearing that an interrogation of the defendant had occurred and that such interrogation was not preceded by the giving of *Miranda* warnings. The state does not assert any contrary arguments here. Accordingly, the issue before us is a narrow one; our focus is on the court's explicit legal conclusion that the defendant's privilege against self-incrimination was not violated because he was not in police custody during his interrogation.

Our Supreme Court has observed that "[n]o definitive list of factors governs a determination of whether a reasonable person in the defendant's position would have believed that he or she was in custody. Because, however, the *Miranda* court expressed concern with protecting defendants against interrogations that take place in a police-dominated atmosphere containing inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely . . . circumstances relating to those kinds of concerns are highly relevant on the custody issue." (Citation omitted; internal quotation marks omitted.) *State v. Atkinson*, 235 Conn. 748, 758, 670 A.2d 276 (1996). Although our case law does not furnish a formulaic analysis to resolve the issue of custody, we will focus on several factors that our courts have deemed to be highly relevant in determining whether an individual was in custody during an interrogation.

First, the defendant voluntarily accompanied the detectives to the detective bureau at the city hall annex

for questioning. The court found that "King . . . asked the defendant if he would be willing to come into police headquarters to talk with [the detectives], and the defendant agreed." The fact that the defendant accompanied the detectives voluntarily supports a determination that he was not in police custody. See *State* v. *Britton*, 283 Conn. 598, 612, 929 A.2d 312 (2007); *State* v. *Turner*, 267 Conn. 414, 438, 838 A.2d 947, cert. denied, 543 U.S. 809, 125 S. Ct. 36, 160 L. Ed. 2d 12 (2004); *State* v. *Atkinson*, supra, 235 Conn. 760; *State* v. *Pagan*, 107 Conn. App. 118, 125, 944 A.2d 387, cert. denied, 287 Conn. 917, 951 A.2d 568 (2008).

Second, the court found that, during the automobile ride to the city hall annex, the detectives repeatedly informed the defendant that he was not under arrest and that he was free to leave at any time. During questioning, the defendant was told repeatedly that he was free to leave. Our Supreme Court has stated: "[A] fact finder reasonably might find that a reasonable person would feel free to leave when that person was told repeatedly that he could do so. See *State* v. *Greenfield*, 228 Conn. 62, 71 n.10, 634 A.2d 879 (1993) (an important factor distinguishing a consensual encounter from a seizure is whether the police expressly informed the defendant that he was free to leave at the outset of the interview); *State* v. *Northrop*, 213 Conn. 405, 415, 568 A.2d 439 (1990) ([i]t is difficult to conceive of a reasonable man who would not feel free to leave after having been told so many times and in so many ways that he could)." (Internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 413, 736 A.2d 857 (1999). The defendant did not state that he wanted to leave the detectives' presence until after he had viewed photograph number four. At that time, he stated that he wanted to leave and was permitted to do so freely. Additionally, the evidence reflects that the defendant was not questioned for an extensively long period of

time, but approximately forty-five minutes. See, e.g., id., 414 (two and one-half hour interrogation in nonhostile environment does not give rise to determination that defendant in custody).

Third, the defendant was not physically restrained or subjected to police force in a manner consistent with a formal arrest. The detectives transported the defendant to the city hall annex in the backseat of an unmarked automobile that did not have a cage separating the front and back of the automobile. The automobile's back doors could be opened by the backseat occupant. At no time was the defendant placed in handcuffs. Furthermore, the defendant was not placed in a locked room or a jail cell at the city hall annex; the door to the questioning room was kept open during questioning. There was no evidence that the detectives displayed any type of weapons during their encounter with the defendant. Factors of this type strongly support a determination that a reasonable person in the defendant's position would not have believed that he was in police custody. See, e.g., *State* v. *Britton*, supra, 283 Conn. 612 (court deems it relevant that defendant "not handcuffed or subjected to force"); *State* v. *Kirby*, 280 Conn. 361, 396, 908 A.2d 506 (2006) (court relies on fact defendant not handcuffed prior to questioning but after arrest); *State* v. *Turner*, supra, 267 Conn. 439 (court observes defendant "not threatened in any way" prior to or during interrogation); *State* v. *Atkinson*, supra, 235 Conn. 760 (court relies on fact detectives did not threaten or use force, display weapons or threaten defendant in any way); *State* v. *Doyle*, 104 Conn. App. 4, 14, 931 A.2d 393 (court deems it relevant interview occurred in unlocked room and defendant not physically restrained in any way), cert. denied, 284 Conn. 935, 935 A.2d 152 (2007).

Fourth, prior to questioning there had been no formal arrest of the defendant, and he was informed that he

was not under arrest. Such factors support a determination that a person in the defendant's position would not reasonably believe that he was in police custody. See, e.g., *State* v. *Britton*, supra, 283 Conn. 612 (defendant "told repeatedly that he was not under arrest and that he could leave at any time").

Fifth, the detectives transported the defendant in an unmarked automobile. The fact that the detectives provided transportation to the defendant in and of itself does not necessitate a determination that he was in police custody. See, e.g., id., 606; *State* v. *Pinder*, supra, 250 Conn. 412; *State* v. *Atkinson*, supra, 235 Conn. 760; *State* v. *Pagan*, supra, 107 Conn. App. 122. Additionally, there was no evidence that the automobile had police lights or sirens, or that they were activated when the detectives approached or transported the defendant. These factors made it less likely that a person in the defendant's position reasonably would have believed that he was compelled to accompany the detectives to police headquarters but could not voluntarily reject the request to accompany the detectives. See *State* v. *Burroughs*, 288 Conn. 836, 849–51, 955 A.2d 43 (2008) (noting that use of overhead flashing lights, side spotlights and sirens conveys police authority and supports determination that reasonable person would believe he was not free to leave presence of police).

In analyzing the facts of this case, we are mindful that "[a] person, even if a suspect in a crime, is not in custody every time he is asked questions at a police station." *State* v. *Northrop*, supra, 213 Conn. 415. Here, the interview occurred in an interview room at the city hall annex being used by the detective bureau, and the door to the room remained open during the interrogation. Even an interview in a closed door setting does not necessarily give rise to a determination that the interview was custodial in nature. See, e.g., *State* v.

*Turner*, supra, 267 Conn. 440 ("mere fact that the defendant's interview took place behind closed doors at the police station does not entitle the defendant to *Miranda* warnings").

Having reviewed the court's findings of fact and the evidence in the entire record, we conclude that a reasonable person in the defendant's position would not have believed that he was in custody.[4] Accordingly, we agree with the trial court that the defendant did not demonstrate that he was entitled to *Miranda* warnings. The court properly denied the defendant's motion to suppress evidence on that ground.

Before concluding our analysis of this issue, we address certain facts on which the defendant relies to demonstrate that he was in custody. The defendant draws our attention to Gomez' testimony at the suppression hearing that he was on patrol duty, and presumably in uniform, when he observed the defendant. After at least one other officer arrived on the scene, Gomez approached the defendant and told him that "[h]e has

---

[4] In resolving the issue of custody, our sole focus is on objective factors surrounding the interrogation of the defendant. Nevertheless, in our scrupulous examination of the record, we observe that the defendant's conduct at the city hall annex reflected his subjective belief that he was not in police custody during the interrogation. The defendant informed the police that he wanted to leave after being shown photograph number four. After King told the defendant that an arrest warrant would be forthcoming, the defendant freely provided his cellular telephone number to King who wrote it on the back of one of the photographs shown to him so that King could call him when the warrant had been issued. The defendant left the interview room without incident after he had declined a ride from the detectives.

As our Supreme Court has observed, "the act of leaving may, in hindsight, lend credence to a determination that the suspect was actually free to leave during the course of the questioning . . . ." *State* v. *Pinder*, supra, 250 Conn. 416. Moreover, the evidence, including the defendant's testimony at the suppression hearing, reflects that the defendant had an extensive arrest history and that he was familiar with police conduct that was incident to a formal arrest. The defendant testified, for example, that he was fingerprinted following his prior thirty-eight arrests. The police did not fingerprint the defendant on September 4, 2007.

to be questioned for a . . . burglary that happened a couple days ago and . . . detectives . . . should be here soon to talk to you." Gomez testified that, thereafter, the detectives arrived on the scene within "a minute and a half." The defendant asserts that Gomez' initial statement reasonably could be construed to suggest that the defendant was not free to leave the scene and that the presence of uniformed patrol officers and two detectives would lead a reasonable person to believe that he or she was in custody. For the reasons discussed below, we disagree that these facts are dispositive.

Certainly, the number of police personnel who approached the defendant on a public street could influence our analysis of the issue of custody. In the present case, however, the evidence reflects that Gomez approached the defendant, spoke with him briefly and then stepped away from the defendant when the two detectives arrived on the scene very shortly thereafter. Gomez' testimony, deemed credible by the trial court, does not give rise to any concerns that Gomez would have led a person in the defendant's position to believe that he was in custody during the very brief time period before the detectives arrived on the scene.[5] Certainly, there is no claim made or evidence to suggest that

---

[5] Gomez testified at the suppression hearing that, after observing the defendant and notifying police headquarters, he "detained" the defendant after "cover" arrived upon the scene. Certainly, Gomez' subjective assessment, that he had "detained" the defendant does not govern our analysis. See *Yarborough* v. *Alvarado*, 541 U.S. 652, 663, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004) (subjective views of police irrelevant in assessing whether suspect in custody). Gomez testified that he was not patrolling the area in a police cruiser, but on a Segway. He did not arrest the defendant, place him in handcuffs or restrain him in a police automobile but told the defendant that "[h]e has to be questioned for . . . a burglary that happened a couple days ago and . . . detectives are coming [and] should be here soon to talk to you." Gomez testified that the defendant merely replied, "no problem." Gomez testified that he did not indicate that the defendant could not leave the scene.

Gomez interrogated the defendant. Furthermore, the words and conduct of the detectives, fully analyzed above, were sufficient to dispel any notion that the defendant was not free to leave the scene or that his attendance at an interview was in any way required. In analyzing the facts of the case, we do not view some of them in artificial isolation but in light of all of the facts relevant to our analysis.

Also, the defendant relies on King's suppression hearing testimony that he told the defendant that he fit the description of the restaurant burglar and that "he was a suspect" in the crime. Under the circumstances present, the defendant's being labeled "a suspect" does not cause us to conclude that the defendant was in custody. The United States Supreme Court has stated: "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case. In sum, an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury* v. *California*, 511 U.S. 318, 325, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994).

Further, the defendant draws our attention to the trial testimony of Ruiz that, when he came upon the defendant, the defendant was with a female companion and was carrying containers of food. The defendant

asserts that when he accompanied the detectives, he was separated from his food and his female companion, and that these facts support a conclusion that he was taken into police custody. These facts do not affect our conclusion. The weight of the evidence wholly supports the court's finding that the defendant accompanied the detectives to police headquarters of his own free will; the natural consequence of that decision was that the defendant became separated from his food and his female companion. Stated otherwise, the police, by use of force or restraint, did not separate the defendant from his food or his female companion. Consequently, the defendant's argument is untenable.

Additionally, the defendant argues that the fact that he was photographed at the police headquarters—a procedure that invariably occurs following an arrest—supported a conclusion that he was in police custody. The court's findings, amply supported by the evidence, readily weaken this contention. The court found that the defendant agreed to be photographed by the police: "King . . . explained . . . that [the defendant] was a suspect in the burglary of the restaurant and asked the defendant if he could take some photographs of him, and the defendant agreed." The defendant freely decided to accompany the detectives to the city hall annex, the police asked the defendant if they could photograph him, and he voluntarily agreed to be photographed. The photograph was taken voluntarily and cannot be said to have resulted from any restriction on the defendant's freedom. Accordingly, the fact that the detectives took photographs of the defendant does not lead us to conclude that he was in custody.

Finally, the defendant asserts that his mere presence in an interview room at the city hall annex in the presence of two detectives, after being driven to that location by the detectives, strongly supports a finding that he was in custody. As our previous analysis reflects,

these facts, viewed in artificial isolation, are by no means dispositive because, under the circumstances present, they do not reflect any degree of restraint on the defendant's freedom, let alone that degree of restraint associated with an arrest. The defendant also argues that, in light of the circumstances of this case, neither the fact that he repeatedly was told that he was free to leave nor that he was not placed in handcuffs necessarily leads to a conclusion that he was not in custody. We agree that neither of these factors is dispositive of the issue of custody; for this reason, our analysis has taken into consideration all of the facts and evidence relevant to the issue of custody in the present case. These facts, viewed as a whole, lead us to conclude that a custodial interrogation of the defendant did not occur on September 4, 2007.

The judgment is affirmed.

In this opinion the other judges concurred.