STATE OF CONNECTICUT *v.* ANGEL C.*
(AC 34019)

Alvord, Espinosa and Sullivan, Js.

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued May 22—officially released July 24, 2012

*Auden Grogins*, special public defender, for the appellant (defendant).

*Melissa L. Streeto*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Edward R. Narus*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ESPINOSA, J. The defendant, Angel C., appeals from the judgment of conviction, rendered following a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (4), sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) and risk of injury

to a child in violation of General Statutes § 53-21 (a) (2).[1] The defendant claims that the trial court improperly (1) denied his motion to suppress evidence and (2) admitted certain evidence. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In 1996, when the female victim was six years of age, the defendant and the victim's mother began a long-term romantic relationship while living in Peru. The defendant and the victim's mother later had two children together, moved to East Hartford and were married. The victim lived at the family residence with her half-siblings, her mother and the defendant. The defendant exercised a great deal of influence and control over what occurred in the household, such that the victim was subservient to him and feared him. From the time that the victim was ten years of age, the defendant forcibly engaged in frequent and secretive sexual activities with her. These activities began with the defendant touching the victim's private parts over her clothing with his hands and penis. They escalated to the defendant digitally penetrating the victim's vagina. The defendant compelled the victim to view pornography and to masturbate him. Finally, from the time that the victim was fourteen years of age until she was eighteen years of age, the defendant engaged in penile-vaginal intercourse with the victim on nearly a daily basis.

For many years, the victim, who was emotionally traumatized by the defendant's assaultive conduct, did not bring the defendant's activities to light because of the defendant's role as the head of the family, her fear that doing so would tear the family apart and her fear that the defendant would abuse her siblings. Additionally, the defendant often told the victim that he loved

---

[1] The trial court imposed a total effective sentence of thirty years incarceration.

her and bought gifts for her. When the victim was a senior in high school, she began to experience panic attacks. During an ensuing psychiatric evaluation, she revealed the sexual abuse committed by her stepfather, the defendant. The defendant's arrest followed.[2] The present appeal followed the defendant's conviction and sentencing.

I

First, the defendant claims that the court improperly denied his motion to suppress inculpatory statements that he made on January 11, 2008, to Patrick Sullivan, an East Hartford police officer, prior to his arrest. We disagree.

Prior to trial, the defendant filed a written motion to suppress the statements on the ground that his *Miranda* rights were violated.[3] After holding an evidentiary hearing, the court issued a memorandum of decision denying the defendant's motion. The following facts found by the court are relevant to the defendant's claim: "On November 16, 2007, the East Hartford police department received a complaint that [the victim] had been sexually assaulted by her stepfather, the defendant, over a period of seven years. Officer Patrick Sullivan from the department's juvenile division investigated the complaint. Based on the allegations, the defendant was his only suspect.

"Officer Sullivan first met the defendant on November 16, 2007. On that day he went to the home where the defendant and his wife, [W], and stepdaughter, [the

---

[2] At trial, the defendant testified, in relevant part, that he had sexual intercourse with the victim on nearly a daily basis after she became sixteen years old. He testified that the victim initiated the relationship and that the victim falsely accused him of sexual assault because she sought attention and was upset with his decision to end the relationship.

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

victim], resided. The officer advised the defendant of the allegations made and asked the defendant to leave the residence during the pendency of the investigation. The defendant complied with the officer's request. All communication was in English. The defendant appeared to understand the conversation and responded appropriately.

"On November 29, 2007, Officer Sullivan called the defendant at his place of employment and requested that the defendant come to the East Hartford police department for an interview. The defendant chose the date and time for that interview, the afternoon of December 6, 2007. He provided his own transportation both to and from the police department. At the time of the interview, the defendant was still a suspect but he was not under arrest. He was not in custody.

"Officer Sullivan spoke with the defendant in a room located in the police department juvenile division. It was a standard interview room with a desk, chairs, a television and mirror. Aware that the defendant was born in Peru, Officer Sullivan asked that Officer Rosario, a bilingual officer, observe the interview and translate if necessary.

"Officer Sullivan spoke with the defendant in English. The defendant responded in English. He did not exhibit any difficulty comprehending the English language. Officer Sullivan could understand the defendant's responses.

"Officer Sullivan read the defendant's *Miranda* rights. The defendant acknowledged the individual rights, initialing each on the police form used by Officer Sullivan. The defendant also provided his name, age, and education. He stated that he could read, write, and understand English. The defendant was aware that he could leave the interview room at any time.

"Officer Sullivan advised the defendant that [the victim] had made some serious allegations involving the defendant, specifically sexual assault. The defendant denied all allegations, stating that there had never been any sexual contact.

"The first interview lasted approximately one hour. At the conclusion, Officer Sullivan offered the defendant an opportunity to [submit to] a polygraph [examination]. The defendant was hesitant and asked to speak with counsel before committing to a lie detector test. At that point the interview ended and the defendant left the police station.

"Several weeks later, Officer Sullivan phoned the defendant and asked if the defendant had consulted an attorney about the polygraph test offer. At that time, the defendant had not made any decision.

"After that conversation, the defendant met [with W], who confronted him and demanded the truth. Initially the defendant denied any sexual contact. He subsequently told [W] that he and [the victim] were in love. He claimed the romance began after [the victim's] sixteenth birthday and eventually progressed to sexual intercourse.

"[W] told Officer Sullivan about her meeting with the defendant. Based on [W's] information, Officer Sullivan phoned the defendant and requested an interview. He and the defendant agreed to meet at the East Hartford police station on January 11, 2008. Once again the defendant provided his own transportation to the police station. He and Officer Sullivan communicated in English. The interview occurred in the same room that the parties had used in December, 2007.

"As the defendant and Officer Sullivan walked to the interview room, the defendant indicated that he needed to talk. The officer read the defendant's *Miranda* rights.

The defendant again acknowledged each right and signed the accompanying waiver form. The defendant did not have any difficulty either understanding the officer or responding to questions.

"Officer Sullivan advised the defendant that [W] had provided additional information about the pending allegations. The defendant at first denied meeting [with W]. Later in the interview the defendant admitted he had met [with] his wife. He further acknowledged that he had sexual relations with [the victim], but claimed that their relationship began after [the victim's] sixteenth birthday. The defendant stated that he and [the victim] were in love and that all sexual contact had been consensual.

"At that point Officer Sullivan advised the defendant that he intended to apply for a warrant. The interview ended and the defendant left the police station.

"Throughout both interviews, the defendant was not in custody. He was free to leave the officer's presence at any time. He could have terminated the interviews at any time. He was not under pressure to answer questions."

In his motion, the defendant asserted that he was not properly advised of his constitutional rights; he did not knowingly, voluntarily and intelligently waive his constitutional rights; the statements were not voluntarily made; and the statements were the fruit of an illegal arrest. The court based its denial of the motion on several grounds. First, it concluded that the defendant was not in custody at the time that he made the statements at issue. The court stated: "[T]he interviews were not custodial. There was no evidence that the defendant was restrained at the time of the statements. He was free to move about. Officer Sullivan did not threaten the use of force. The defendant failed to establish a

custodial interrogation." Alternatively, the court concluded that the defendant knowingly, intelligently and voluntarily waived his *Miranda* rights. Later, at trial, the state presented evidence of the defendant's inculpatory statements to Sullivan.

On appeal, the defendant claims that the court should have suppressed the statement that he gave to Sullivan on January 11, 2008, because it was obtained in violation of his constitutional rights.[4] He challenges the court's determination that he was not in custody at the time he made the statements at issue. He argues that, in light of all of the circumstances surrounding his interrogation, a reasonable person in his position would have believed that he was in police custody.[5] Moreover, he argues that the court's determination that he waived his *Miranda* rights was improper because, although he signed a waiver of rights form prior to making the statements, he did not understand the form and, thus, could not properly waive his right against self-incrimination. He asserts that Spanish is his primary language, the form was in English and the police did not provide him with the services of an interpreter. He asserts that he was unfamiliar with police procedure and that "he felt pressured by Sullivan to sign the waiver form . . . ."

"It is well established that the prosecution may not use statements, whether exculpatory or inculpatory,

---

[4] The defendant argues that, insofar as his statements were obtained in violation of his right against self-incrimination, a violation of his federal and state constitutional rights occurred. Beyond alleging a violation of his rights under article first, § 8, of the Connecticut constitution, however, the defendant has not provided this court with an independent analysis under our state constitution. For this reason, we will confine our analysis of the claim to the federal constitution. See, e.g., *State* v. *Benton*, 304 Conn. 838, 843 n.3, 43 A.3d 619 (2012).

[5] The defendant also asserts that his inculpatory statements were the fruit of an illegal arrest. We do not address this aspect of the claim because it is unaccompanied by any analysis.

stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . The defendant bears the burden of proving that he was in custody for *Miranda* purposes. . . .

"A defendant in custody is subject to interrogation not only in the face of express questioning by police but also when subjected to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . Whether a defendant in custody is subject to interrogation necessarily involves determining first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that such conduct is reasonably likely to elicit an incriminating response. . . .

"As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . As we have noted previously, however, when a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the

court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . .

"The question of whether a defendant is in custody for purposes of a custodial interrogation involves a two step inquiry. The trial court first makes a factual determination of the circumstances surrounding the alleged interrogation and then applies those facts to an objective test as to whether a reasonable person would have felt that he or she was not at liberty to leave. . . . The first inquiry is factual and will not be overturned unless, after a scrupulous examination of the record, we find that it is clearly erroneous. . . . The second question calls for application of the controlling legal standard to the historical facts [which is a question of law]. . . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo." (Internal quotation marks omitted.) *State* v. *Bridges*, 125 Conn. App. 72, 78–79, 6 A.3d 223 (2010), cert. denied, 300 Conn. 931, 17 A.3d 68 (2011).

"[A]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . A person is in custody only if, in view of all the surrounding circumstances, a reasonable person would have believed [that] he was not free to leave. . . . Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. Thus, in determining whether *Miranda* rights are required, *the only relevant inquiry*

*is whether a reasonable person in the defendant's posi-
tion would believe that he or she was in police custody
of the degree associated with a formal arrest.*" (Cita-
tions omitted; emphasis in original; internal quotation
marks omitted.) *State* v. *Turner*, 267 Conn. 414, 434,
838 A.2d 947, cert. denied, 543 U.S. 809, 125 S. Ct. 36,
160 L. Ed. 2d 12 (2004).

We observe that the defendant's claim focuses only
on the interview that Sullivan conducted on January
11, 2008. The state does not appear to dispute the court's
implicit finding that, for purposes of a *Miranda* analy-
sis, the defendant was interrogated by Sullivan on that
date at the police department.

We readily conclude that, with regard to the issue of
custody, the court's findings of fact were supported by
substantial evidence and that the court properly applied
the governing law to the facts found. The record amply
demonstrates that Sullivan contacted the defendant by
telephone, requesting a second interview. Sullivan did
not appear at the defendant's home or place of employ-
ment and forcibly escort the defendant to the police
department. The defendant voluntarily accepted Sulli-
van's request, agreeing to meet Sullivan at the police
department on January 11, 2008. The defendant pro-
vided his own transportation to the interview. The inter-
view occurred in a room in which Sullivan, earlier,
had interviewed the defendant, and from which the
defendant freely had exited the police department. The
waiver of rights form that the defendant signed and
initialed prior to the interview states: "I have been
advised and I know that I can refuse to answer ques-
tions, or I may stop answering questions at any time I
so desire." The defendant was not formally arrested
prior to the interview and did not ask to terminate the
interview. There was no evidence that the defendant
physically was restrained. Rather, the defendant left the
police department at the conclusion of the interview. On

these facts, we do not conclude that a reasonable person in the defendant's position would have believed that he was in police custody and not free to leave.

The defendant draws our attention to several factors which, considered individually or in combination, he argues, support a conclusion that he was in police custody. We address them briefly. He draws our attention to the uncontroverted evidence that he was alone with Sullivan during the interview, Sullivan was armed with a police revolver during the interview and the interview occurred in a closed interrogation room at the police department. The defendant points to evidence that he had to walk up a flight of stairs to reach the interrogation room, and that the room had a limited right of ingress and egress. Also, the defendant relies on evidence that he subjectively believed that, at the time of the interrogation, he was not free to leave. Finally, the defendant argues that he "had no experience dealing with the police" and had a limited understanding of the English language.

Initially, we observe that the defendant's statement that, at the time of the interview on January 11, 2008, he "had no experience dealing with the police," is inaccurate in light of the uncontroverted evidence that the defendant had several encounters with Sullivan during his investigation prior to that date. These encounters included the interview that occurred on December 6, 2007, as discussed in the court's memorandum of decision denying the motion to suppress. The defendant does not assert that he had been in police custody during any of these prior interactions between himself and Sullivan. Furthermore, we observe that the defendant's subjective lack of familiarity with police procedures or his subjective belief with regard to the issue of custody does not govern our analysis. " '[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective

views harbored by either the interrogating officers or the person being questioned. . . . Thus . . . it is irrelevant that the defendant may have been a novice to police questioning. His subjective beliefs about whether he was in fact free to leave have no bearing on whether he was in custody for *Miranda* purposes.'" *State* v. *Edwards*, 299 Conn. 419, 441, 11 A.3d 116 (2011), quoting *State* v. *Turner*, supra, 267 Conn. 439.

The defendant has not demonstrated that his command of the English language was so poor that he reasonably believed that he had been taken into police custody at the time that he made the statements at issue. In its memorandum of decision, the court expressly found that the defendant's version of events was not credible. In another part of its decision, the court found: "During each discussion [between the defendant and the police], the defendant was articulate and cooperative. The challenged conversations were conducted in English, a language the defendant understood. There is no competent evidence that his decision to talk with the police was influenced by a lack of understanding or comprehension of what was occurring or what was being said." Our thorough review of the evidence leads us to conclude that this finding was supported by substantial evidence.

The defendant places a great deal of emphasis on the fact that the interview in question occurred at the police department. Our case law, however, plainly instructs that this is not a dispositive factor in evaluating the issue of custody. As our Supreme Court has observed, "[a] person, even if a suspect in a crime, is not in custody every time he is asked questions at a police station." *State* v. *Northrop*, 213 Conn. 405, 415, 568 A.2d 439 (1990). The fact that Sullivan was alone with the defendant, that Sullivan was armed during the interview and that it occurred in a closed room with limited ingress and egress to the general public does not lead us to

conclude that the defendant was in custody. There is no evidence that Sullivan took any steps to restrain the defendant's freedom of movement, suggested that the defendant was not free to leave or gave the defendant reason to believe that he was locked in the interrogation room. The fact that Sullivan conducted the interview one on one with the defendant does not tend to demonstrate that the defendant was physically restrained.

Insofar as the defendant asserts that he was in custody because the police viewed him as a suspect and that Sullivan was seeking a confession from him, we are not persuaded. "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Stansbury* v. *California*, 511 U.S. 318, 325, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994).

On the basis of our careful review of the record, we conclude that the court properly concluded that the defendant's statements to Sullivan were not the product of a custodial interrogation. Accordingly, the court properly denied the defendant's motion to suppress evidence.

II

Next, the defendant claims that the court improperly admitted evidence concerning his financial support of three children of his, by another woman, who were living in Peru during his relationship with W. We disagree.

The record reflects that, during the state's direct examination of W, the victim's mother, she testified about her relationship with the defendant, which began in their native country, Peru. She described the defendant's high degree of control of family decisions and

finances during their relationship. Absent objection, she testified that it was not until 2000, after she had her second child with the defendant and had moved with the defendant from Peru to East Hartford, that she first learned that the defendant had three children with another woman in Peru outside of their relationship, and that he had been supporting those children financially.

During the defendant's direct examination, he discussed the financial situation of both himself and W in Peru and, later, after they moved to the United States. He testified about his employment history and his obligation to support his two children with W. Specifically, he discussed his employment during his relationship with W, and how his employment affected his ability to care for W and his children with W, both before and after they moved from Peru to the United States. He testified that he worked long hours and sent funds to Peru to make sure that W, the victim and the defendant's first child with W could come to the United States. Also, he testified that he earned the money to purchase the family home, and that the decision to purchase the home was motivated in part by his care for his children. The defendant discussed the fact that, when W became pregnant with his daughter in Peru, he began living with her out of a sense of taking responsibility for his child.

During the defendant's cross-examination, he reiterated that he began living with W once she became pregnant with his daughter because he wanted to care for and be financially responsible for his child. The prosecutor then asked the defendant: "So, when that happened, who was taking responsibility for your other two children that you had prior to having that daughter with [W]?" The defendant's attorney objected on the ground that the question exceeded the scope of direct examination because, on direct examination, the defendant had not testified about these other children. The

prosecutor replied: "Well, that's my point. I was getting into his willingness to take responsibility for children . . . as being the motive for moving in." The court overruled the objection. The defendant testified that he had a third child outside of his relationship with W, in Peru, and that he provided financial support to all of his three children who were living in Peru.

Later, during questioning about the defendant's finances, the prosecutor asked the defendant: "The mother of your other children didn't work and have any income; correct?" The defendant's attorney objected to the inquiry but did not set forth a ground for the objection before the court precluded reference "to the mother of his other children."

The state inquired into the defendant's financial obligations to his children in Peru. The prosecutor asked: "[From] [w]hich checking account or bankbook did you write the checks out for those payments to Peru?" The defendant's attorney objected to the inquiry on the ground that "[t]here is absolutely nothing in the direct [examination] regarding him writing checks to anyone in Peru" and on the ground that the inquiry lacked a proper foundation in the evidence. The defendant's attorney stated: "Your Honor, on direct I asked absolutely nothing about his family, money being sent to children in Peru. I never even mentioned that he had children in Peru." The court, noting that the defendant had testified about his family responsibilities and his personal finances, overruled the objection.

In response to additional questioning by the prosecutor regarding the payments that the defendant made to support his children in Peru, the defendant testified that, immediately after he moved to the United States, he began sending support payments to Peru through "a company" and that W was aware of these payments. On the ground that it went beyond the scope of the

direct examination, the defendant's attorney objected to an inquiry about the defendant borrowing money from an employer, presumably to send to Peru. The court ruled that the inquiry was "[n]ot going far afield," but that the prosecutor adequately had covered the matter. Thereafter, the court precluded further inquiry into the amount of the payments to Peru and how frequently they were made.

The prosecutor did not refer to evidence of this nature in his closing argument. During the defendant's closing argument, the defendant's attorney argued that the inquiry concerning the defendant's support of children in Peru was nothing more than an attempt to attack the defendant's character on the ground that he has five children with two different women, and that he left three of those children behind, in Peru, when he moved to the United States. The defendant's attorney suggested that the defendant's decision to provide financial support to his children was a positive trait. Responding to this argument, the prosecutor, during rebuttal argument, stated that the point of the inquiry was to bolster W's testimony that the defendant had a history of acting unilaterally and secretively in terms of running the family and making decisions, and that this trait carried over to his secretive and assaultive conduct toward the victim.

On appeal, the defendant claims that the inquiries discussed previously were not relevant to any issue before the jury, elicited unduly prejudicial testimony and were beyond the scope of the defendant's direct examination. "Our standard of review is well established. Unless an evidentiary ruling involves a clear misconception of the law, the [t]rial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make

every reasonable presumption in favor of upholding the trial court's ruling . . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Citation omitted; internal quotation marks omitted.) *Corbett* v. *Commissioner of Correction*, 133 Conn. App. 310, 318, 34 A.3d 1046 (2012).

Preliminarily in our analysis of the claim, we observe that, although the defendant's attorney raised objections to the challenged inquiries at trial, the objections were made on the grounds that the inquiries were beyond the scope of the direct examination and that they lacked an adequate foundation in the evidence. The defendant's attorney did not distinctly raise any objection on the grounds of relevance or undue prejudice at the time of trial. Accordingly, we decline to address these aspects of the present claim, which are raised for the first time on appeal. "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the

court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 408 n.18, 902 A.2d 1044 (2006).

In summary fashion, the defendant requests that this court review any inadequately preserved aspects of his claim under the plain error doctrine; Practice Book § 60-5; or under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The aspects of the claim involving relevance and undue prejudice are not reviewable under *Golding* because the unpreserved issues are evidentiary, not constitutional in nature. The defendant merely asserts that the issues are of constitutional magnitude because "[t]he convictions in this case implicate the defendant's presumption of innocence and fair trial rights . . . ." This type of reasoning effectively would transmute every evidentiary ruling in a criminal prosecution into a ruling of constitutional magnitude. "The defendant bears the responsibility of demonstrating that his claim is indeed a violation of a fundamental constitutional right. . . . The defendant cannot raise a constitutional claim by attaching a constitutional label to a purely evidentiary claim or by asserting merely that a strained connection exists between the evidentiary claim and a fundamental constitutional right. . . . Generally, the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved." (Citations omitted; internal quotation marks omitted.) *State* v. *Wells*, 111 Conn. App. 84, 90, 957 A.2d 557, cert. denied, 289 Conn. 958, 961 A.2d 423 (2008). Furthermore, the defendant has not demonstrated that plain error exists with regard to these unpreserved evidentiary claims.

Having determined that the claim properly before us relates to the court's determination that the inquiries about the defendant's care for his children in Peru did

not relate to matters outside the scope of the defendant's direct examination, we observe that "[a]lthough cross-examination is restricted to the matters covered in direct examination, except insofar as the cross-examination relates to credibility . . . such restriction rests in the trial court's sound discretion. . . . A question on cross-examination is within the scope of the direct examination if it is designed to rebut, impeach, modify, or explain any of the defendant's direct testimony. . . . In determining whether cross-examination is within the scope of the direct examination, the trial court is allowed a liberal discretion . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Scott*, 11 Conn. App. 102, 107, 525 A.2d 1364, cert. denied, 204 Conn. 811, 528 A.2d 1157 (1987).

Having carefully reviewed the defendant's examination and cross-examination, we are not persuaded that the inquiry into the defendant's care for his children in Peru exceeded the scope of his direct examination. The direct examination encompassed the defendant's employment and financial obligations during his relationship with W, and it elicited evidence that the defendant's life decisions and employment were motivated in part by his concern for W, his children with W and the victim. The defendant, through his testimony, portrayed himself as a person deeply committed to the well-being of his family. The state's inquiry obviously related to the defendant's financial obligations during his relationship with W, as well as his commitment to providing for all of his children. On this record, we do not conclude that the court abused its broad discretion in permitting the inquiry as being within the scope of the direct examination. Furthermore, to the extent that the inquiry had a tendency to impeach the defendant's testimony concerning his financial obligations during his relationship with W and his concern for his children, the inquiry

was proper because it directly related to the jury's assessment of the defendant's credibility.

The judgment is affirmed.

In this opinion the other judges concurred.